UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA MARIE JACKSON,

    Plaintiff,

v.

                                      Case No. 10-cv-14985
                                      Paul D. Borman
                                      United States District Judge

BETTY WILLIAMS, in her
individual and official capacity,
GENESEE COUNTY JAIL
ADMINISTRATOR-LEROY COBB,
in his individual and official capacity,
GENESEE COUNTY SHERIFF-ROBERT
J. PICKELL, in his individual and official
capacity, ANDREE WILLIAMS, in her
individual and official capacity,
GENESEE COUNTY, and CORIZON
HEALTH, INC.

    Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. No. 57)

Plaintiff Melissa Marie Jackson filed this action on December 16, 2010, alleging state and federal constitutional claims arising out of her arrest and confinement at the Genesee County Jail from August 18, 2010, to August 20, 2010. (Dkt. No. 1.) In her Amended Complaint, filed on October 16, 2011, Plaintiff named the following Defendants: Andree Williams ("Williams"), Leroy Cobb ("Cobb"), Robert J. Pickell ("Pickell"), Genesee County (the "County"), and Corizon, Inc. ("Corizon"). (Dkt. No. 40.)

1

On March 8, 2012, the Court entered an Opinion and Order Granting Defendant Corizon, Inc.'s Motion to Dismiss. (Dkt. No. 54.) The parties stipulated to the dismissal of Defendants Pickell and Cobb, and on March 22, 2012, Defendants Williams and the County filed the instant Motion for Summary Judgment. (Dkt. No. 57.) Plaintiff filed a Response on April 14, 2012. (Dkt. No. 59.) Defendant filed a Reply on May 14, 2012. (Dkt. No. 61.) The Court held a hearing on July 25, 2012.

For the reasons stated below, the Court will GRANT in part and DENY in part Defendants' Motion for Summary Judgment.

## I. BACKGROUND

The undisputed facts in this matter are as follows.

On Wednesday, August 18, 2010, Plaintiff was visiting her boyfriend, Tyree Dye, who was an inmate at the Genesee County Jail. After the visit, Plaintiff left the jail and crossed West 5th Street on the northern-facing side of the jail. As was her usual custom, Plaintiff stood on a public sidewalk across from the Genesee County Courthouse, facing the jail, and tried to catch a parting glance at Mr. Dye in the windows of the jail, so that she could blow kisses and wave goodbye. On this particular occasion, Plaintiff began writing with chalk on the curb facing the jail: "My Love, My Everything, Kisses."

While Plaintiff was waiting on the sidewalk, a uniformed police officer pulled up to her in a marked SUV and talked to Plaintiff for approximately 10 minutes. (Defs.' Mot. Ex. 1, Jackson Dep. 97-98.) Plaintiff claims that the officer flirted with her and asked her for her phone number, but did not tell her that she should move or that she was not permitted to stand on the sidewalk. (Jackson Dep. 98-99.) Plaintiff declined to give her number and the officer left. (Jackson Dep. 99.)

Shortly thereafter, Defendant Williams, who was driving to the jail in her patrol car at the end of her shift, saw Plaintiff writing with chalk on the curb. Defendant Williams, who weighs approximately 200 pounds, exited her vehicle and approached Plaintiff, who weighs approximately 138 pounds, ultimately cuffing her and placing her under arrest. Plaintiff and Defendant Williams have provided differing testimony as to what occurred immediately prior to Plaintiff's arrest.

### A. Plaintiff's Account

Plaintiff testified that Defendant Williams was yelling at her after exiting her patrol car, but Plaintiff could not understand what she was saying until Defendant Williams came much closer. (Jackson Dep. 102-03.) At that point, Plaintiff states that Defendant Williams "said get the fuck out of here and pointed her finger in [Plaintiff's] face" and started "chest bumping" Plaintiff. (Jackson Dep. 102.) Plaintiff told Defendant Williams that she believed she had permission to stand on the sidewalk and that she was not breaking any laws. (Jackson Dep. 109.) "I was in shock. I said, wow, this is what my tax dollars pay for, and that's what I said." (Jackson Dep. 109.)

Plaintiff testified that she left when Defendant Williams asked her to leave, but that Defendant Williams then called her back to get her name. (Jackson Dep. 110.) Plaintiff stated that she told Defendant Williams her name and then asked Defendant for her name. (Jackson Dep. 112.) After she asked Defendant Williams for her name, Plaintiff claimed that Defendant Williams covered the nametag on her jacket. "She refused to let me see it, and when I -- when I asked her again, that's when she threw me to the ground and arrested me." (Jackson Dep. 113.) After she was on the ground, Plaintiff testified that Defendant Williams drove her knee into her

3

back and handcuffed her. (Jackson Dep. 121.) Several other officers then came outside and helped escort Plaintiff into the jail. (Jackson Dep. 128.)

**B. Defendant Williams's Account**

Defendant Williams testified that she initially approached Plaintiff because Defendant Williams believed she was in "an area that's to me very high security[,]" because it was near the driveway that judges use to access the Genesee County Courthouse. (Defs.' Mot. Ex. 6, Williams Dep. 20.) Defendant Williams believed the courthouse was on high alert at the time, and that "[a]ny person that was standing around that didn't have reason to be there needed to move on, did not need to be in that area." (Williams Dep. 47.) Nevertheless, Defendant Williams admitted that the public sidewalk outside of the courthouse was a lawful place for Plaintiff to stand. (Williams Dep. 58-59.)

Defendant Williams states that she asked Plaintiff what she was doing before crossing the street and approaching her. "I think she said something like, 'I'm writing on the curb. I'm writing on the curb.' She was real flip . . . ." (Williams Dep. 42.) Defendant Williams described her confrontation with Plaintiff as follows:

> A. I think I asked her, I said, "Ma'am, you're going to have to leave this area because this is a secured area. You're going to have to stop writing on the curb." And she said, "I don't have to stop doing this. I don't have to stop doing this. They told me I could do it." I said, "Who told you you could write on the curb?" She said, "The people in the jail." I'm like, "They told you you could write on the curb?" and she said, "Yeah, I can write on the curb. I do it in Grand Rapids." I said, "Well this is Genesee County. We have enough issues here. No, you can't write on the curb here." She said, "Well I pay your taxes (sic) and I can do whatever I want." I said, "Okay," so I called the jail.
>
> ( . . . . )

4

> A.  I spoke first with Lt. Schneider -- Schmeider. I'm sorry, Lt. Schmeider, and asked him, "did anyone give this lady permission?" And then he put on Mr. Cobb and I said, "Mr. Cobb, there's a lady here saying that she received permission from someone in the jail," and he said, "Absolutely not. Tell her to leave the area."
> 
> And so while I'm talking to her, she's ranting and raving and screaming at me, putting her finger in my face. I wasn't mad or upset because this is how people react to police all the time, it seems like it.
> 
> I said, "Ma'am, you need to leave the area," and she's like, "I'm not going anywhere. I don't have to leave," and it's like all of a sudden she decided she was going to leave. She started walking up the street and all of a sudden she came back real quickly, fast, and got in my face and starts pointing, "I don't have to leave. What is your name? What is your name? I pay your taxes (sic). I don't have to leave. I don't have to do anything."

(Williams Dep. 43-46.)

Corrections Administrator Leroy Cobb testified that he remembered receiving a call from Defendant Williams, during which Williams asked if a deputy had given Plaintiff permission to write on the sidewalk. (Defs.' Mot. Ex. 2, Cobb Dep. 8-9.) Cobb told Defendant Williams that Plaintiff did not have permission to write on the sidewalk. (Cobb Dep. 9.)

Defendant Williams testified that she asked Plaintiff to leave the area, but that Plaintiff "was like yelling and screaming. She was in my face, pointing. She was very close in my face, pointing, screaming, yelling." (Williams Dep. 53.) Defendant Williams stated that she warned Plaintiff, "'Ma'am, I'm going to arrest you if you don't leave. I'm going to arrest you if you don't leave. Please leave. Please leave.' Again, she was like crazed at this point." (Williams Dep. 48.)

When Plaintiff refused to leave, Defendant Williams testified that she placed Plaintiff under arrest. "I laid her down on the ground real gently and I handcuffed her from the back." (Williams Dep. 49.) At that point, other officers had come out from the jail to assist Defendant

5

Williams, and Plaintiff was escorted into the Genesee County Jail. (Williams Dep. 50.) Defendant Williams denies that she ever hid her nametag from Plaintiff. "I said, 'Ma'am, you see my name. My name is right here.' I don't have a problem with her seeing my name." (Williams Dep. 53.)

**C. Plaintiff's Imprisonment**

During the booking process, Plaintiff notified Genesee County Jail employees that she had suffered scrapes on her hands and knees when Defendant Williams forced her to the ground and handcuffed her. However, at her deposition, Plaintiff described these scrapes as "very minor." (Jackson Dep. 136, 141.) "You know, it wasn't even as bad as a little kid skinning their knee on a sidewalk." (Jackson Dep. 142.)

Plaintiff also stated that she had released urine while being restrained by Defendant Williams, soiling her underwear. (Jackson Dep. 181-82.) Plaintiff testified that she was not permitted to take a shower and was given a pair of used boxers to replaced her soiled underwear, which caused her to develop a yeast infection. (Jackson Dep. 180-83.)

Plaintiff's medical intake form indicates that she was referred to the medical department and was checked by a "Nurse Cheryl," but there was no other follow-up. (Pl.'s Resp. Ex. E, Medical Intake Form.) Plaintiff admitted that she did see a nurse during the booking process, but testified that the nurse laughed at her when Plaintiff showed her the scrapes on her hands and knees, "and she said people come in here with broken jaws." (Jackson Dep. 135.)

Plaintiff further complained that she was having chest pains and difficulty breathing, indicating that she was having a panic attack, and requested her prescribed anti-anxiety medication. (Jackson Dep. 145-46.) However, Plaintiff testified that the nurse did not assist her with any of her medical concerns.

6

> A. The deputy -- Well, first at booking I told them that I was having a panic attack in booking.
>
> ( . . . . )
>
> A. A panic attack in -- in -- in booking, and I told them I needed medication at the time. They said that I would have to see the nurse before I get medication.
>
> Q. (BY MR. REISING): All right.
>
> A. The nurse wouldn't even hear what I had to say about medication, and that they said that was a controlled substance, and I can't get it without a prescription or whatever. . . .

(Jackson Dep. 145-46.)

Plaintiff stated that a jail employee told her that her anxiety medication had to be verified, and that "they don't give narcotic medication in the jail." (Jackson Dep. 146.) Corrections Administrator Cobb confirmed that prescription medications are not regularly dispensed before they are reviewed and verified by the medical staff, except where an inmate has a life-threatening condition. (Cobb Dep. 20.)

After she was assigned to a holding cell, Plaintiff complained to a guard about her ongoing panic attack, requesting emergency medical attention. Plaintiff testified that the guard told her, "if I don't shut the fuck up, she's going to put me in a green suit and threw [sic] me in the hole." (Jackson Dep. 147.)

Plaintiff testified that she has never seen a mental health professional for any issues related to her arrest and imprisonment. (Jackson Dep. 165.) Plaintiff claimed that she has had "numerous panic attacks" in her life, but admitted that she had never passed out as a result of a panic attack. (Jackson Dep. 150-51.) Plaintiff also testified that she gets migraines when her stress level is high, and that "[m]aybe once a year" she goes to the emergency room as a result of

7

a migraine. (Jackson, Dep. 25-26.) However, Plaintiff has never required an overnight stay for her migraines. (Jackson Dep. 25.)

On the morning of August 19, 2010 – the morning after Plaintiff's alleged panic attack – Plaintiff was disciplined for talking to another inmate during breakfast, and was placed in 24-hour lockdown. (Jackson Dep. 153-54; Defs.' Mot. Ex. 11, Incident Report.) The Incident Report states that Plaintiff was "talk[ing] excessively and laugh[ing] at the tables." (Defs.' Mot., Ex. 11, Incident Report.)

At some point that day, another inmate provided Plaintiff with a medical request form that she could use to request her anxiety medication. (Jackson Dep. 155.) Plaintiff filled out the form and put it in her cell door, but the jail nurse never picked it up. (Jackson Dep. 157.)

Plaintiff was released on the morning of August 20, 2010, pending further investigation of her charges. (Jackson Dep. 145; Pl.'s Resp. Ex. F, PFI Release, Warrant Request, and Dismissal.) A Warrant Request for disturbing the peace was denied by the Genesee County Prosecutor, who stated on the request "What was the disturbance that [defendant] was causing[?] I see none." (*Id.*) On October 13, 2010, the charges of resisting arrest and disorderly conduct against Plaintiff were dismissed with prejudice. (*Id.*)

## II. STANDARD OF REVIEW

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact[.]" Fed. R. Civ. P. 56(c). The Court must, however, view the evidence and draw all reasonable inferences in favor of the party opposing summary judgment. *Matsushita Electric Industrial Co., Ltd., et al. v. Zenith Radio Corp., et al.*, 475 U.S. 547, 587 (1986). Still, "the

mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). The test is whether a rational trier of fact could, based on the evidence presented as a whole, find in favor of the non-moving party. *Matsushita*, 475 U.S. at 587.

## III. ANALYSIS

Plaintiff's Amended Complaint alleges the following nine claims:[1] (1) 42 U.S.C. § 1983 violation of Plaintiff's right to parent under the Due Process Clause of the Fourteenth Amendment; (2) 42 U.S.C. § 1983 Fourth and Fourteenth Amendment violations – false arrest, false imprisonment, malicious prosecution and unreasonable search and seizure; (3) 42 U.S.C. § 1983 Fourth and Fourteenth Amendment violations – cruel and unusual punishment of pretrial detainee, failure to provide adequate medical care or treatment against Defendant Corizon; (4) 42 U.S.C. § 1983 Eighth Amendment violations – cruel and unusual punishment; (5) 42 U.S.C. § 1983 Eighth Amendment violations – Cruel and Unusual Punishment as to Defendant Corizon; (6) State law claim for false arrest; (7) State law claim for false imprisonment; (8) State law claim for malicious prosecution; and (9) state law claim for abuse of process.

At the July 25, 2012 hearing on this matter, the parties stipulated to the dismissal of counts (1) and (4). Accordingly, the claims that remain before the Court are count (2) and counts (6)-(9).

---

[1] As noted *supra*, pursuant to the Court's March 8, 2012 Opinion and Order, the claims against Defendant Corizon (Counts (3) and (5)) have been dismissed and are not at issue in the instant motion for summary judgment.

9

### A. Fourth and Fourteenth Amendment Claims for False Arrest, False Imprisonment, Malicious Prosecution, and Unreasonable Search and Seizure

*1. False Arrest/Unreasonable Search and Seizure*

Plaintiff alleges that Defendant Williams violated her Fourth and Fourteenth Amendment rights when Defendant Williams arrested Plaintiff. Defendants assert that Defendant Williams's actions were supported by probable cause. Defendants rely on M.C.L. § 764.15(1)(a), which provides that "[a] peace officer, without a warrant, may arrest a person . . . [when a] felony, misdemeanor, or ordinance violation is committed in the peace officer's presence." Defendants contend that Defendant Williams had probable cause to arrest Plaintiff because writing on a public street curb with chalk constitutes a misdemeanor under a City of Flint Ordinance. *See* Flint, Mi., Code § 31-12(k) (defining a "disorderly person" as a person who "Knowingly destroys, damages or defaces or removes any public property or other property not his own.").

Defendants argument is not convincing. It stretches the bounds of credulity to believe that a reasonable police officer could view writing on a street curb with chalk as an arrestable offense, particularly given the non-vulgar nature of Plaintiff's message in the instant matter. *See Mackinney v. Nielsen*, 69 F.3d 1002, 1005 (9th Cir. 1995) (finding that police officer who arrested plaintiff for writing on sidewalk with chalk was not entitled to qualified immunity because "[n]o reasonable person could think that writing with chalk would damage a sidewalk."). Furthermore, chalk writing is not permanent and easily washes away with water, and is normally completely erased after a simple rain storm. It therefore does not constitute destroying, damaging, or defacing public property within the meaning of the City of Flint Ordinance cited by Defendants.

Given the conflicting testimony in Plaintiff's and Defendant Williams's depositions, viewing the evidence in a light most favorable to Plaintiff, a reasonable juror could conclude that

10

Plaintiff was attempting to comply with Defendant Williams's demands that she leave by walking away. A reasonable juror could also believe that Plaintiff was still complying when she walked back to Defendant Williams after Defendant Williams asked for Plaintiff's name, and that Defendant Williams did not have probable cause to throw Plaintiff to the ground and arrest her when Plaintiff asked to see Defendant Williams's name. Accordingly, the Court will deny Defendants' motion regarding Plaintiff's claim for unreasonable seizure arising under the Fourth and Fourteenth Amendments.

*2. Excessive Force*

In her Response brief, Plaintiff asserts that "[n]otwithstanding the glaring absence of probable cause, Defendant Williams' use of force to subdue and arrest Plaintiff was clearly excessive." (Pl.'s Resp. 14.) Defendants argue that Plaintiff never included an excessive force claim in her Amended Complaint and is barred from adding one at this time. The Court agrees.

Plaintiff does not use the words "excessive force" anywhere in her Amended Complaint. Plaintiff's Fourth and Fourteenth Amendment claims are explicitly for false arrest, false imprisonment, malicious prosecution, and unreasonable search and seizure. (Am. Compl. 8.) Plaintiff may not seek to re-characterize her claim in a response brief; she must file a motion to amend pursuant to Federal Rule of Civil Procedure 15. Plaintiff has not done so, and the Amended Complaint fails to plead a claim for excessive force.

*3. Equal Protection*

Plaintiff alleges that Defendants violated her right to equal treatment under the Equal Protection Clause of the Fourteenth Amendment. Defendants argue that Plaintiff has failed to properly plead a cause of action for equal protection. Plaintiff contends that other people were

permitted to stand on the sidewalk across from the jail and waive to inmates, and that she was treated differently due to her sex, because other jail personnel were jealous of her appearance.

"The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats on differently than others similarly situated without any rational basis for the difference." *Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011). As evidence of discrimination, Plaintiff cites the following excerpt from her deposition:

> Q.   All right. So you had a conversation with this detective a week or so after August 18th?
>
> A.   Uh-huh.
>
> ( . . . . )
>
> Q.   And you're telling me in that conversation he told you what again?
>
> A.   That basically what I -- what did I expect, that all the women in the whole department are hatin -- he used street terminology -- that are hatin because there's a beautiful woman out here and all the guys are talking about me.

(Jackson Dep. 84, 86.)

Despite Plaintiff's contention, the above excerpt does not support the theory that Plaintiff was discriminated against on the basis of her sex or gender. Rather, it shows that Plaintiff may have been treated differently on the basis of personal characteristics not necessarily specific to her sex, *i.e.*, having an attractive appearance.

Plaintiff may succeed on a "class-of-one" theory, however, if she can show that she was treated differently from other similarly situated individuals, and that there was no rational basis for the difference in treatment. *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011). "In determining whether individuals are 'similarly situated,' a court should not demand exact

12

correlation, but should instead seek relevant similarity." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012). "A plaintiff may demonstrate that the government action lacks a rational basis . . . either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006).

Plaintiff has not produced sufficient evidence to sustain her equal protection claim on a "class-of-one" theory. The jail personnel were on high alert on the day of Plaintiff's arrest. Although she testified that she had seen other people standing on the sidewalk across from the jail, she was the only person there on that day. Moreover, the high alert constitutes a rational basis for the challenged government action, even if Plaintiff's arrest was ultimately unreasonable. Furthermore, the discriminatory animus evidenced in Plaintiff's conversation with a detective at the Genesee County Jail is inadmissible hearsay, and therefore cannot defeat summary judgment. *See* Fed. R. Civ. P. 56(c)(2). Plaintiff's argument that the detective's comments are a non-hearsay admission under FRE 801(d)(2)(D) is unavailing, because the comments were not "concerning a matter within the scope of the [detective's] agency or employment[.]"

Accordingly, Plaintiff has failed to produce sufficient evidence to support her equal protection claim.

*4. False Imprisonment/Cruel and Unusual Punishment*

Plaintiff alleges that Defendants were deliberately indifferent to her mental health needs when they failed to supply her anxiety medication. Defendant argues that Plaintiff has failed to establish that her anxiety constitutes a sufficiently serious medical condition that rises to the level

of a constitutional deprivation. Defendant does not address the second, subjective component of the deliberate indifference analysis.

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from treatment by jail officials that is so deliberately indifferent "as to unnecessarily and wantonly inflict pain[.]" *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001). To show deliberate indifference to a serious medical need, a plaintiff must establish an objective and subjective component:

> The objective component requires an inmate to show that the alleged deprivation is "sufficiently serious." As the Supreme Court explined in *Farmer*, "The inmate must show that he is incarcerated under condition posing a substantial risk of serious harm." To satisfy the subjective component, an inmate must show that prison officials had "a sufficiently culpable state of mind."

*Id.* (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)).

The Sixth Circuit has recognized that psychological needs can constitute serious medical needs, "especially when they result in suicidal tendencies." *Horn by Parks v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994).

Plaintiff has not established that her panic attacks were so "sufficiently serious" as to pose a substantial risk of serious harm. Plaintiff testified that the attacks left her faint and short of breath, and caused her heart to race, but that she has never passed out as a result of an attack. (Jackson Dep. 150-51.) Plaintiff did not provide any testimony that her anxiety and depression caused her to be suicidal or a risk to herself or others. Plaintiff has therefore failed to show that her mental health condition posed a substantial risk of serious harm.

*5. Malicious Prosecution*

"The Sixth Circuit recognizes a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment, which encompasses wrongful investigation, prosecution, conviction, and incarceration." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (citation and punctuation omitted). A claim for malicious prosecution requires the plaintiff to show (1) that a criminal prosecution was initiated against the plaintiff, and that the defendant influenced or participated in the decision to prosecute; (2) there was not probable cause for the prosecution; (3) the plaintiff suffered a "deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure[;]" and (4) that the criminal proceeding resolved in the plaintiff's favor. *Id.* at 308-09 (citations omitted).

It is undisputed that a criminal prosecution was initiated against Plaintiff, and that Defendant Williams participated in the decision to prosecute. (Pl.'s Resp., Ex. F, PFI Release, Warrant Request, and Dismissal.) It is also undisputed that the criminal proceeding resolved in Plaintiff's favor when it was dismissed. (*Id.*) As discussed *supra*, taking the evidence in a light most favorable to Plaintiff, there was not probable cause for her arrest. Plaintiff's continued incarceration without probable cause constitutes a deprivation of liberty under the Fourth Amendment apart from the initial seizure. *See Gregory v. City of Louisville*, 444 F.3d 725, 748-49 (6th Cir. 2006) (discussing malicious prosecution claims where the alleged injury is "continued detention without probable cause."); *see also Sykes*, 625 F.3d at 308-09. Accordingly, viewing the evidence in a light most favorable to Plaintiff, a reasonable juror could find in her favor on her malicious prosecution claim under the Fourth and Fourteenth Amendments.

**B. State Law Claims**

*1. False Arrest*

"In order to prevail on a claim of false arrest or imprisonment, the plaintiff must show that the arrest was not legal, i.e., that it was made without probable cause." *Tope v. Howe*, 179 Mich. App. 91, 105 (1989). As stated *supra* at part A, there is a question of fact as to whether Defendant Williams had probable cause to arrest Plaintiff. Plaintiff's false arrest claim under state law therefore will not be dismissed.

*2. Malicious Prosecution*

Malicious prosecution is a "disfavored" cause of action in Michigan. *King v. Arabic*, 159 Mich. App. 452, 464 (1987). A claim for malicious prosecution under Michigan law requires four elements: "(1) Prior proceedings terminated in favor of the present plaintiff; (2) Absence of probable cause for those proceedings; (3) Malice, defined as a purpose other than that of securing the proper adjudication of the claim; and (4) A special injury that flows directly from the prior proceedings." *Payton v. City of Detroit*, 211 Mich. App. 375, 394-95 (1995). Michigan courts have held that "the only situation in which an action for malicious prosecution would properly lie is where a police officer knowingly swears to false acts in a complaint, without which there is no probable cause." *King*, 159 Mich. App. at 466 (citation omitted).

Plaintiff has not established that the criminal action against her was initiated for a purpose other than the proper adjudication of the claim. While she has testified that a detective at the Genesee County Jail told her that individuals at the jail were "hatin" her, that testimony is inadmissible for reasons stated *supra*. Furthermore, Plaintiff does not claim that the facts in the warrant request or criminal complaint against her were knowingly false. Accordingly, Plaintiff has failed to establish her claim for malicious prosecution.

16

*3. Abuse of Process*

"To recover pursuant to a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose, and (2) an act in the use of process that is improper in the regular prosecution of the proceeding." *Bonner v. Chicago Title Ins. Co.*, 194 Mich. App. 462, 472 (1992). "[T]here must be some corroborating act that demonstrates the ulterior purpose." *Id.*

Plaintiff argues that Defendants used the legal process to deter her from visiting the jail. Plaintiff's sole evidence of this alleged improper motive is her conversation with the Genesee County Jail detective, which is inadmissible. Plaintiff has not produced any evidence of a "corroborating act" that shows Defendants' alleged improper motive. Plaintiff's abuse of process claim is therefore dismissed.

**C. Municipal Liability**

Plaintiff has stipulated to the dismissal of all state law claims against the Defendant County.

Under § 1983, a municipality is generally not liable for the tortious actions of its employees "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Moldowan v. City of Warren*, 578 F.3d 351, 394 (6th Cir. 2009) (quoting *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Plaintiff argues that Defendants' medical policy violates the constitution, because it does not adequately address a new inmate's mental health needs upon admission to the Genesee County Jail. Plaintiff argues that new inmates are only entitled to mental health medication if they are in a life threatening condition.

Genesee County Corrections Administrator, Leroy Cobb, testified that when new inmates are processed for medications, "the medical department will look at the medications and make a

determination if that medication is a medication that that person would need in an emergent situation or life-threatening situation." (Defs.' Mot. Ex 2, Cobb Dep. 33.) Cobb testified that, with non-emergent medications, the medical department determines if those medications are required while the inmate is in the Genesee County facility. (*Id.*)

Furthermore, Plaintiff admits that she filled out a medical questionnaire and spoke with a nurse during the booking process. (Jackson Dep. 133, 135.)

Viewing this evidence in a light most favorable to Plaintiff, a reasonable juror could not conclude that Genesee County did not have a policy in place to address inmate mental health issues. The claims against the County are therefore dismissed.

## V. CONCLUSION

For the reasons stated above, the Court will **GRANT** in part and **DENY** in part Defendants' Motion for Summary Judgment. The only remaining Defendant is Defendant Williams.

**SO ORDERED.**

_____
PAUL D. BORMAN
UNITED STATES DISTRICT COURT JUDGE

Dated: 8-20-12
Detroit, Michigan